RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0058p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

HABIB KHADAIR ABBAS AL-ADILY,

                *Petitioner*,

        *v.*

MERRICK B. GARLAND, Attorney General,

                *Respondent*.

No. 22-3432

─────────────────

On Petition for Review from the Board of Immigration Appeals;
No. A 071 675 432.

Argued: December 6, 2022

Decided and Filed: March 30, 2023

Before: SILER, GILMAN, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Frank G. Becker, Southfield, Michigan, for Petitioner. Robbin K. Blaya, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Frank G. Becker, Southfield, Michigan, for Petitioner. Robbin K. Blaya, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

    GILMAN, J., delivered the opinion of the court in which NALBANDIAN, J., joined. NALBANDIAN, J. (pp. 10–11), delivered a separate concurring opinion. SILER, J. (pp. 12–16), delivered a separate dissenting opinion. The Appendix (pg. 17) contains a copy of Exhibit A from the Administrative Record.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.  Habib Al-Adily, a citizen of Iraq and a lawful permanent resident of the United States, was late in returning his rental car to Thrifty-Rent-a-Car (Thrifty).  He was indicted under a Michigan statute criminalizing the willful failure to timely return rental property, an offense to which he pleaded guilty and for which he was ordered to pay over $10,000 in restitution to Thrifty.  Two Immigration Judges (IJs) and the Board of Immigration Appeals (BIA) concluded that these circumstances warranted Al-Adily's deportation for having been convicted of an aggravated felony under the Immigration and Nationality Act (INA).  For the reasons set forth below, we **GRANT** Al-Adily's petition for review, **REVERSE** the BIA's decision, and **REMAND** to the BIA with instructions to terminate the removal proceedings against him.

## I.  BACKGROUND

After returning his rental car to Thrifty 163 days past its due date, Al-Adily pleaded guilty to failing to return rental property worth between $1,000 and $20,000, in violation of Mich. Comp. Laws § 750.362a(3)(a).  He was ordered by the state court to pay $10,660.56 in restitution, an amount precisely matching the itemized restitution request submitted by Thrifty.  That request included a daily loss-damage-waiver charge for a total of 170 days, vehicular repair costs, an airport concession fee, and state and municipal taxes.  Thrifty's itemization is attached to this opinion as Exhibit A.  Al-Adily did not challenge the restitution amount in state court.

The Department of Homeland Security (DHS) then initiated removal proceedings against Al-Adily.  DHS alleged that Al-Adily's conviction for failing to timely return rental property constituted an aggravated felony under 8 U.S.C. § 1101(a)(43)(M)(i).  That statute, when read in conjunction with 8 U.S.C. § 1227(a)(2)(A)(iii) (which allows for the deportation of noncitizens who have been convicted of aggravated felonies under the INA), renders a conviction for "an offense that . . . involves fraud or deceit in which the loss to the victim or victims exceeds $10,000" grounds for removal from the United States.  *See* 8 U.S.C. § 1101(a)(43)(M)(i).

Although DHS bore the burden of establishing Al-Adily's removability by clear and convincing evidence, and Al-Adily argued that the restitution amount of $10,660.56 was greater than Thrifty's actual loss, IJ Marsha Nettles found Al-Adily removable as charged. She noted several oddities in Thrifty's itemization, but felt that she was bound by the restitution amount.

Al-Adily did not appeal IJ Nettles's decision, but with the assistance of new counsel seven years later, he moved to reopen his removal proceedings. IJ David Paruch granted the motion. In effect, such a grant reopens "for consideration [] any and all matters which [the IJ] deems appropriate in the exercise of his administrative discretion." *See Matter of Patel*, 16 I. & N. Dec. 600, 601 (BIA 1978).

IJ Paruch expressly deemed IJ Nettles's removability determination worthy of reconsideration, but concluded that Thrifty's loss amount was necessarily equal to the amount of restitution ordered by the state court. He also denied Al-Adily's applications for withholding of removal and relief under the Convention Against Torture. Al-Adily appealed to the BIA, which affirmed IJ Paruch's decision and likewise declined to pursue an inquiry into which elements of Thrifty's itemized restitution request were properly included in the loss amount. The BIA denied Al-Adily's subsequent motion to reconsider its decision. Al-Adily now seeks our review of the BIA's denial.

## II. DISCUSSION

Although Al-Adily argued at various points throughout his removal proceedings that a conviction under Mich. Comp. Laws § 750.362a(3)(a) does not constitute "an offense that involves fraud or deceit," *see* 8 U.S.C. § 1101(a)(43)(M)(i), his attorney has failed to raise the issue in Al-Adily's petition for review. We therefore assume, without deciding, that a conviction under Mich. Comp. Laws § 750.362a(3)(a) is a categorical match for a fraud-or-deceit aggravated felony under the INA. Whether Al-Adily's specific offense involved a "loss to the victim or victims exceed[ing] $10,000," however, *see id.*, is subject to "a circumstance-specific approach." *Nijhawan v. Holder*, 557 U.S. 29, 40 (2009).

Al-Adily does not dispute that he was ordered to pay more than $10,000 in restitution to Thrifty. A probation order, a presentence report, Thrifty's itemized restitution request, and

Al-Adily's own admissions all support the conclusion that the restitution amount was $10,660.56. But Al-Adily cannot be found to have been convicted of an aggravated felony merely because he has been ordered to pay *restitution* to the victim in an amount that exceeds $10,000. He is removable as charged only if he has been convicted of "an offense that . . . involves fraud or deceit in which the *loss* to the victim or victims exceeds $10,000." *See* 8 U.S.C. § 1101(a)(43)(M)(i) (emphasis added). That loss, moreover, "must be tied to the specific counts covered by the conviction." *Nijhawan*, 557 U.S. at 42 (citation omitted). A cursory review of Exhibit A reveals that Thrifty's actual loss was clearly *less* than $10,000. And DHS certainly did not meet its burden of proving by "clear and convincing" evidence, *see id.* (quoting 8 U.S.C. § 1229a(c)(3)(A)), that the loss *exceeded* that amount.

Restitution orders, the BIA has held, "can be sufficient evidence of loss to the victim in certain cases, but they must be assessed with an eye to what losses are covered and to the burden of proof employed." *Matter of Babaisakov*, 24 I. & N. Dec. 306, 319 (BIA 2007); *accord Nijhawan*, 557 U.S. at 42. In fact, "the record of conviction is an uncertain source of reliable information on loss to the victim." *Babaisakov*, 24 I. & N. Dec. at 320. This is so because "[t]he information generated on loss is routinely done for sentencing purposes, not for 'conviction' purposes, and may have been assessed against a 'preponderance of the evidence' standard." *Id.*

The importance of a careful review is magnified in a case such as the one before us where the petitioner is alleged to have exceeded the aggravated-felony threshold by only $660.56. *See id.* at 320 n.11 ("[T]he degree by which a loss is found to exceed $10,000 may also bear on whether evidence derived from a restitution order or [presentence report] could carry the burden in removal proceedings."); *cf. Nijhawan*, 557 U.S. at 32, 42-43 (finding the restitution amount to be clear and convincing evidence of a loss greater than $10,000 where the petitioner presented no conflicting evidence and $683 million was ordered in restitution); *Pilla v. Holder*, 458 F. App'x 518, 521-22 (6th Cir. 2012) (finding the sentencing materials to be clear and convincing evidence of a loss greater than $10,000 where DHS had produced "a sentencing memorandum in which [the petitioner] admitted that 'an appropriate estimate of the total loss caused by the crime to which [she] has entered her guilty plea exceeds $10,000'" (second alteration in original) and restitution had been ordered in the amount of $66,000); *Ibe v. Holder*, 406 F. App'x 23, 26 (6th

Cir. 2010) (finding the record of conviction to be clear and convincing evidence of a loss greater than $10,000 where the indictment alleged a loss of $45,000, and $29,000 was ordered in restitution).

Michigan law provides that the court should "consider the amount of the loss sustained by any victim as a result of the offense" when determining the restitution amount, Mich. Comp. Laws § 780.767(1), but the prosecution does not need to prove that amount beyond a reasonable doubt. Instead, "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by a preponderance of the evidence." *Id.* § 780.767(4). The restitution amount in Al-Adily's case was not subject to even this lower burden because, as both IJs, the BIA, and counsel for the government repeatedly pointed out, Al-Adily did not contest the restitution amount in state court. "Only an actual dispute, properly raised at the sentencing hearing [with] respect to the type or amount of restitution, triggers the need to resolve the dispute by a preponderance of the evidence." *People v. Grant*, 565 N.W.2d 389, 400 (Mich. 1997) (citing Mich. Comp. Laws § 780.767(4)).

Despite admonitions by both the BIA and the Supreme Court that restitution orders must be considered with caution, especially where the restitution amount was initially determined under a lower evidentiary standard, the IJs and the BIA deferred uncritically to the state court's determination in conflating the restitution amount with Thrifty's actual loss. In denying Al-Adily's motion to reconsider notwithstanding this error, the BIA abused its discretion. *See Alizoti v. Gonzales*, 477 F.3d 448, 451 (6th Cir. 2007) ("The BIA abuses its discretion when it acts arbitrarily, irrationally, or contrary to law."); *Trujillo Diaz v. Sessions*, 880 F.3d 244, 248 (6th Cir. 2018) ("We will find an abuse of discretion if the BIA's denial . . . 'inexplicably departed from established policies . . . .'") (quoting *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005)).

The BIA's analysis is further flawed in noting that Al-Adily did not offer conflicting evidence of Thrifty's loss beyond "[s]tatements by counsel," which "are not evidence." In fact, DHS itself provided conflicting evidence in the form of Thrifty's itemized restitution request. The problem with the criminal court's wholesale adoption of that request is twofold. First, the itemization is internally inconsistent. Second, several of the enumerated charges do not stem

from "the specific counts covered by the conviction," *see Nijhawan*, 557 U.S. at 42, or were not "losses" at all. Both points are discussed below.

## A. Thrifty's itemization is internally inconsistent

Thrifty cannot have simultaneously lost revenue from the daily loss-damage-waiver charge (the LDW) and borne the cost of the "mild damage on the [car's] rear bumper" while the car was in Al-Adily's possession. DHS's evidence indicates that Al-Adily rented the car on June 23, 2007 and contracted to return it on June 30, 2007. As part of the contract, Al-Adily paid for the LDW, for which he was to be charged $16.95 per day. The LDW ensured that Al-Adily's "responsibility for loss of or damage to the vehicle [would be] waived in full or in part, . . . provided [that] the rental agreement [wa]s not violated." The car was apparently damaged when it was returned to Thrifty, and Al-Adily was charged $1,757.02 for the repairs.

As IJ Nettles pointed out, Thrifty was entitled to collect the $1,757.02 for repairs despite Al-Adily's having purchased the LDW because, according to the rental agreement, Al-Adily's responsibility for the damage would have been waived only if the rental agreement was not violated. By failing to return the car on time, Al-Adily violated the rental agreement and so was fully responsible for any damage to the vehicle.

However, as IJ Nettles also observed, when Al-Adily violated the contract by failing to return the car by June 30, the LDW clause of the contract was "nullified":

> The provision . . . clearly states that LDW will not be in existence and is not effective if the car rental agreement is violated. . . . It is undisputed that the respondent did not return the vehicle by the date required or as part of the terms of his agreement with Thrifty Car Rental. Therefore, the rental agreement was violated and any argument with respect to the coverage of LDW is completely void, because by the very terms of Thrifty Car Rental's agreement, LDW is eliminated if you violate the rental agreement.

Because the LDW clause of the contract was invalidated by Al-Adily's violation of the contract on June 30, Thrifty was not bound by its obligation to provide Al-Adily with LDW coverage beyond the 7 days that Al-Adily remained in compliance with the contract. But instead of charging Al-Adily for only 7 days of LDW coverage, Thrifty charged him for all 170 days that the rental car remained out of Thrifty's possession. The $2,881.50 that Thrifty listed in its

itemized restitution request is thus not reflective of Thrifty's loss. At most, Thrifty lost $118.65 in LDW fees ($16.95 × 7 days). This brings Thrifty's total loss amount down to $7,897.71. In sum, Thrifty cannot have its cake (recovery of repair costs) and eat it too (170 days of LDW fees).

When pressed at oral argument about Thrifty's LDW charges following the breach, counsel for the government admitted: "We don't know why they were charging that. . . . [T]here's no evidence in here why they did . . . ." But in order to sustain the charge of removability against Al-Adily, DHS bore the burden of proving that the actual loss to Thrifty exceeded $10,000.

**B. Several of the enumerated charges do not stem from "the specific counts covered by the conviction" or are not losses at all**

Thrifty's itemized restitution request also contains items that either cannot rightfully be considered losses or do not stem from Al-Adily's conviction for the willful failure to timely return rental property. The first is the $1,757.02 that Thrifty requested for vehicular repairs.

The relevant statute of conviction criminalizes as larceny the "refus[al] or willful[] neglect[]," "with intent to defraud the lessor," "to return [rental] tangible property" valued between $1,000 and $20,000 "after expiration of the [rental period]." Mich. Comp. Laws § 750.362a (2008). Al-Adily was neither charged with nor convicted of damaging, destroying, or vandalizing Thrifty's property. Yet the criminal court accepted Thrifty's request to include the cost of repairing the car as part of the restitution amount.

"[E]ven a plea to a fraudulent transaction exceeding $10,000, or a sentencing fact found beyond a reasonable doubt"—a standard of proof far beyond what was applied here—"may be suspect if the admission or sentencing factor covered losses associated with transactions outside the particular count or counts covered by the conviction." *Matter of Babaisakov*, 24 I. & N. Dec. 306, 320 (BIA 2007) (citation omitted). The loss anticipated by Al-Adily's statute of conviction extends only to Thrifty's separation from its property. To include repair costs in the loss amount would therefore violate the requirement that losses stem from "the specific counts covered by the conviction." *Nijhawan*, 557 U.S. at 42. Without these repair costs, the loss amount chargeable

to Al-Adily for immigration purposes falls to $6,140.69 ($10,660.56 listed – $2,762.85 in excess LDW charges – $1,757.02 in repair costs).

The criminal court also inappropriately included taxes and airport-recovery fees in its restitution order. Thrifty's "Frequently Asked Questions" page states that

> [a]dditional charges to [the] daily rental rate may include . . . city and state imposed taxes that are in addition to sales tax. Increasingly, city and state governments are taxing rental car customers so that they can pay for their sports stadiums in their cities without having to tax local residents for the money.

So by Thrifty's own admission, the $108 in municipal taxes and the $323 in state taxes that are included in the itemized restitution request were not owed to Thrifty at all. And at oral argument, when asked whether any evidence existed that Thrifty had actually paid the taxes and the $565 airport-recovery fee, counsel for the government responded in the negative. Counsel stated instead that she "d[id]n't have any evidence that they didn't pay." But because DHS bears the burden of establishing Al-Adily's removability by clearing and convincing evidence, the absence of evidence weighs in Al-Adily's favor. Without these tax and airport-recovery charges totaling $996, the loss amount properly chargeable to Al-Adily for immigration purposes drops to a net of $5,144.69, which is far below the $10,000 threshold for a fraud-or-deceit aggravated felony under 8 U.S.C. § 1101(a)(43)(M)(i).

## C. The IJs and the BIA improperly shifted the burden of proof and failed to critically examine the state court's restitution order

The analysis in Parts A. and B. above demonstrates the scope of the BIA's error. And even more fundamental was the BIA's error in requiring Al-Adily to show that the loss incurred by Thrifty was $10,000 or less. Rather, the burden was on DHS to show that Thrifty incurred a loss greater than $10,000. *See Nijhawan*, 557 U.S. at 42.

The BIA must "assess findings made at sentencing 'with an eye to what losses are covered and to the burden of proof employed.'" *Id.* (quoting *Babaisakov*, 24 I. & N. Dec. at 319)). Where, as here, the burden of proof in the criminal court was lower than that required to establish removability, "the petitioner . . . ha[s] . . . two opportunities to contest the amount of loss, the first at the earlier sentencing and the second at the deportation hearing itself." *Id.*

In the present case, the BIA was provided with the evidence and the methodology that the state court used to arrive at the restitution amount. Thrifty explained what it wanted—not necessarily what it lost—and that exact amount, down to the penny, was reflected in the state court's restitution order. The BIA was thus required to evaluate Thrifty's itemization and consider whether its contents properly placed the loss amount above $10,000.

Yet, at every turn, both IJs and the BIA shifted the burden to Al-Adily. IJ Nettles remarked that she would not "subtract out certain things to find that [Thrifty's loss] falls under $10,000." And IJ Paruch refused to engage in a meaningful analysis of the loss amount, stating—contrary to *Babaisakov* and *Nijhawan*—that his court "[wa]s not the proper forum to address that concern. The proper forum to address that concern [wa]s the state court that entered the Order." The BIA subsequently repeated the error, referencing the restitution amount and ending the inquiry there. But Al-Adily was not required to show that the loss amount *did not* exceed $10,000. DHS was required to show that it *did*.

DHS had multiple opportunities to prove that Thrifty's itemized restitution request accurately reflected Thrifty's actual loss. It availed itself of none of them. By affirming Al-Adily's removability notwithstanding DHS's failure to satisfy its evidentiary burden, the BIA abused its discretion. Thrifty's actual loss amount, moreover, is so obviously below the $10,000 threshold as to make further proceedings in this case unnecessary.

## III. CONCLUSION

For all of the foregoing reasons, we **GRANT** Al-Adily's petition for review, **REVERSE** the BIA's decision, and **REMAND** to the BIA with instructions to terminate the removal proceedings against him.

---

**CONCURRENCE**

---

NALBANDIAN, Circuit Judge, concurring. The key to this case is the government's burden to prove that Thrifty suffered a loss over $10,000. And I agree with the lead opinion that the government didn't meet that burden. I write separately with a small quibble about how the lead opinion analyzes the Loss Damage Waiver ("LDW") issue.

The lead opinion concludes that Thrifty could only charge Al-Adily for seven days of LDW coverage. That is, for the term of the original rental agreement and not for the additional 163 days that he kept the car. Thus, the lead opinion determines, Thrifty lost at most $118.65 in LDW fees ($16.95 times seven days). The problem is that I'm not convinced that Thrifty was barred from charging Al-Adily for the 163 days beyond the original contract.

Al-Adily agreed to pay a daily LDW fee starting "at the beginning of the rental." (A.R. 890.) And in exchange, Thrifty agreed to waive "damage to the vehicle . . . in full or in part." (*Id.*) But Thrifty conditioned its end of the bargain on Al-Adily's conduct. So, by the clear terms of the provision, Thrifty did not need to cover Al-Adily with LDW if he violated his car agreement.

The LDW provision, however, didn't state when Thrifty would *stop* charging its daily LDW fee, whether that be (1) when the rental contract is violated, (2) at the original contract term's termination, or (3) as applicable here, when the car is actually returned. The LDW provision only stated that renters must pay a daily fee and may forgo LDW if they violate their rental agreement.

The lead opinion concludes that Al-Adily must only pay the daily LDW fee up until he violates the rental agreement. It states that the LDW clause was "nullified" and that "Thrifty was not bound by its obligation to provide Al-Adily with LDW coverage beyond the 7 days that Al-Adily *remained in compliance* with the contract." (Lead Op. at 6 (emphasis added).) So, for the lead opinion, Al-Adily's breach not only barred him from receiving LDW, but also barred Thrifty from collecting daily fees after Al-Adily's breach occurred.

But in my mind, the LDW was a charge that Al-Adily agreed to for as long as he kept the car. After all, part of the loss amount that we don't question includes the rental fee itself for the 170 days. So it's not clear to me that Thrifty couldn't also have charged the LDW for those days as well. And neither party cites any relevant caselaw interpreting rental car agreements— whether in Michigan or elsewhere.

Regardless, though, I agree that "Thrifty cannot have its cake (recovery of repair costs) and eat it too (170 days of LDW fees)."[1] (*Id.* at 7) To be fair, there might be some scenario where a renter pays for LDW and then blatantly breaches the agreement while damaging the car in a way that the agreement doesn't cover—like totaling the car while taking it off road or entering it into a demolition derby. In such a scenario, perhaps coverage and the premiums would be forfeited because Thrifty would not cover the extent of damage to the car. But no one is arguing that that's the case here.

So I think Thrifty could choose between two options. Either it could (1) collect the 170 days' worth of LDW fees from Al-Adily and cover the vehicle repair costs by itself; or (2) forgo collection of the 163 days' worth of LDW fees but collect the total repair costs from Al-Adily.

But ultimately, rather than getting into the weeds of contract interpretation, we only need to point out that the government failed to meet its burden: It didn't adequately explain why Al-Adily was on the hook for all of the amounts on the restitution statement. And it's not our job to fill in its blanks.

For these reasons, I concur.

---

[1]Again there doesn't seem to be any LDW caselaw directly on point. Although the LDW contract is not an "insurance" contract, Michigan insurance caselaw suggests that Thrifty cannot have its daily fee if it also denies coverage. *See, e.g.*, *Burton v. Wolverine Mut. Ins. Co.*, 540 N.W.2d 480, 483 (Mich. App. 1995) (rejecting an insurance company's request "to earn a premium without having to provide coverage" while reasoning that the company could "either rescind the policy upon discovery of [a violation] and refund the premium or . . . retain[] the premium earned until the effective date of the cancellation and provide coverage until the effective date of the cancellation").

———————————

**DISSENT**

———————————

SILER, Circuit Judge, dissenting.  Because the government demonstrated by clear and convincing evidence that the amount of loss to Thrifty-Rent-a-Car (Thrifty) exceeded $10,000, the BIA did not abuse its discretion in denying Habib Al-Adily's motion for reconsideration. I respectfully dissent from the majority opinion.

To hold that the BIA abused its discretion, we must find that it decided this case without providing a rational explanation, "inexplicably departed from established policies," or rested its decision "on an impermissible basis such as invidious discrimination against a particular race or group." *Dieng v. Barr*, 947 F.3d 956, 960–61 (6th Cir. 2020) (citation omitted).  Establishing abuse of discretion is a heavy burden given the BIA's "broad discretion" in reviewing motions to reconsider. *Chavez-Acosta v. Garland*, No. 22-3045, 2023 WL 246837, at *3 (6th Cir. Jan. 18, 2023) (citing *Alizoti v. Gonzales*, 477 F.3d 448, 451 (6th Cir. 2007)).

Here, it is undisputed that Al-Adily failed to return a rental car to Thrifty until 163 days past the vehicle's due date.  When Al-Adily eventually returned the car, Thrifty billed him $10,660.56, which included loss damage waiver coverage, costs to repair the vehicle, and other associated taxes and fees.  Al-Adily subsequently pled guilty in Michigan state court for failing to return rental property in violation of Mich. Comp. Laws § 750.362a(3)(a), and he was ordered to pay $10,660.56 in restitution.  Neither Al-Adily nor his counsel objected to the restitution order, and Al-Adily made around $3,000 in payments.

Once in immigration proceedings, the IJ carefully reviewed whether Thrifty's loss exceeded $10,000 as required for removal under 8 U.S.C. §§ 1101(a)(43)(M), 1227(a)(2)(A)(iii). The IJ explained that "the government bears the burden of demonstrating the removal charge by clear and convincing evidence" and pointed to the probation order, rental fee restitution breakdown of charges, the presentence investigation report, and Al-Adily's own testimony to demonstrate that the loss to Thrifty exceeded $10,000.  The IJ held that Al-Adily's arguments that Thrifty unfairly charged him for both loss damage waiver coverage and vehicle repairs, that

Thrifty may have had other insurance to cover this kind of loss, and, generally, that Thrifty "used inappropriate charges to reach the restitution amount" were unsupported by the evidence. Al-Adily did not appeal the IJ's order.

Although Al-Adily succeeded in having his immigration proceeding reopened, a different IJ also found that the loss to Thrifty exceeded $10,000. The IJ found that the government bore the burden of demonstrating the loss amount and held that Al-Adily's own admission, conviction and sentencing records, the probation order, and presentence investigation documents demonstrated that the loss amount exceeded $10,000 and was tied to Al-Adily's conviction.

On appeal, the BIA reviewed the IJ's findings and determined that the IJ correctly found that the loss amount exceeded $10,000. The BIA pointed to the restitution order, Al-Adily's own testimony, Thrifty's "itemized list of the components of the restitution order," and the fact that Al-Adily never challenged the restitution amount during his criminal proceedings. The BIA held that Al-Adily's arguments to the contrary were speculative and unsupported by evidence. Al-Adily then filed a motion for reconsideration, which the BIA denied.

The majority holds that the BIA abused its discretion in denying Al-Adily's motion for reconsideration because (1) Thrifty improperly inflated its loss amount to over $10,000, (2) several of the charges do not stem from the count covered by Al-Adily's conviction, and (3) the IJs and BIA improperly placed the burden of proof on Al-Adily instead of the government. I disagree.

Under the first argument, the majority states that once Al-Adily violated his contract, Thrifty was no longer obligated to provide him with loss damage waiver coverage. And, therefore, the company merely wanted to "have its cake . . . and eat it too" by charging him for both the loss damage waiver coverage and repairs. It may be true that Thrifty was not *obligated* to provide such coverage, but neither Al-Adily nor the majority has shown that a company *cannot* charge an individual who willingly violates a rental car agreement for both repairs and loss damage waiver coverage for the days Al-Adily kept the vehicle. As the government reasonably argued, Thrifty made clear that the loss damage waiver only covered loss of or damage to the rental car "in full or in part . . . provided the rental agreement is not violated."

And here, Al-Adily violated the agreement. In fact, Thrifty could have charged Al-Adily much more than it did, including the cost of the entire vehicle plus lost rental revenue. Thrifty clearly explains that "waivers . . . can be purchased to reduce or eliminate your financial exposure which could include the full value of the vehicle and lost rental revenue during its replacement period." However, Thrifty further states that violating the agreement "makes the waiver void." When Al-Adily breached his contract by failing to return the car for 163 days beyond the rental period, Thrifty could have charged him the full cost of the vehicle *and* lost rental revenue. Instead, it chose merely to charge him for the loss damage waiver coverage and cost of repairs.

Once Al-Adily rented the car, the clock on the loss damage waiver started, and there was no reason for it to stop until Al-Adily returned the car in good working order. And no one contests that Al-Adily knew Thrifty wanted the car back and failed to return it until 163 days after it was due, that the car was damaged while it was rented to Al-Adily, and that Thrifty was unable to rent the car to other customers until it was returned and repaired.

The majority points to the first IJ's observation that the contract was "nullified" to support the argument that Thrifty improperly charged Al-Adily for both repairs and loss damage waiver coverage. However, the IJ actually reached the opposite conclusion. The IJ noted that Thrifty was permitted to charge Al-Adily both for repairs and loss damage waiver coverage *because* he violated the contract and returned a car in need of repair long after it was due. And while this conclusion might appear unfair to Al-Adily at first, it was reasonable based on the evidence. After all, there were two distinct harms to Thrifty: (1) Al-Adily kept the car for 163 days beyond the expiration of the rental agreement, thus preventing other customers from renting it, and (2) Al-Adily returned a car in need of repair. Therefore, the IJ did not err in finding that Thrifty could charge Al-Adily for both loss damage waiver coverage and repairs.

Second, the charges stem from Al-Adily's conviction. The majority contends that the repair costs ($1,757.02), excess loss damage waiver coverage ($2,762.85), and the taxes and fees ($996) all fall outside the "specific counts covered by the conviction." *Nijhawan v. Holder*, 557 U.S. 29, 42 (2009) (citation omitted). Without these charges, the amount charged to Al-Adily falls below the requisite $10,000 threshold. However, as the government clearly states, the repair costs, taxes, and airport recovery fees were all to be paid directly to Thrifty, as reflected in

the rental fee restitution agreement, and flowed directly from Al-Adily's failure to return the rental car in violation of Mich. Comp. Laws § 750.362a(3)(a). And this was properly reflected in the restitution order—an order Al-Adily did not contest.

Al-Adily willfully failed to return his vehicle, and Thrifty reasonably charged him (1) $1,757.02 for damages that occurred to the vehicle, and (2) loss damage waiver charges in the amount of $2,762.85 for failing to return the rental car "to a particular place at a particular time." § 750.362a(1). And Al-Adily has cited to no law that an IJ errs by not removing reasonable state and county taxes from a restitution amount. The IJs reasonably determined that the loss to Thrifty was over $10,000 based upon the government's proffered evidence, which included Al-Adily's probation order, a rental fee restitution breakdown of charges, the presentence investigation report, and Al-Adily's own testimony. *Nijhawan*, 557 U.S. at 42–43.

Finally, the IJs and BIA did not apply the wrong standard. Both IJs stated that the government bore the burden of proof, and the BIA relied on the same evidence as the IJs in holding that the loss was greater than $10,000.

Although the majority concludes that the government failed to satisfy its burden of proof, the evidence shows that the government proved the amount of loss to Thrifty exceeded $10,000 by clear and convincing evidence. Al-Adily had the opportunity to contest the amount of loss in both criminal court and in immigration proceedings, *id.* at 42, but he did not contest his restitution order in criminal court. In immigration proceedings, the government pointed to, and the IJs relied upon, (1) the criminal court's restitution order listing the amount as $10,660.56, (2) a Romulus Police Department document "showing that the total rental charges in the amount that the company lost [was] $10,660.56," (3) a presentence investigation report indicating the amount of restitution to be $10,660.56, (4) the terms of the loss damage waiver, and (5) Al-Adily's own testimony that he was ordered to pay restitution in the amount of $10,660.56 and had not contested the amount in criminal court. This is exactly the kind of evidence IJs are supposed to evaluate and rely upon in determining whether the government met its burden. *See In re Babaisakov*, 24 I. & N. Dec. 306, 321 (B.I.A. 2007) (holding that immigration judges may consider "other reliable evidence" including "testimonial admissions of the respondent made during the removal hearing"). In response, Al-Adily could offer nothing more than speculation.

"In the absence of any conflicting evidence," an IJ may rely on "sentencing-related material" to establish a loss amount by clear and convincing evidence. *Nijhawan*, 557 U.S. at 42–43. The IJs properly did so here. Therefore, the BIA did not abuse its discretion in denying Al-Adily's motion for reconsideration.

I respectfully dissent.

# APPENDIX

# EXHIBIT A

Rental Fee Restitution
LG1577984 Al-Adily Habib

Time Out: 06-23-2007  Recovered: 12-10-2007
T&M = 24 Weeks 2 Days = 170 days

| | Per day | Days | Amount | |
|---|---|---|---|---|
| Rental Charges | | | | |
| T&M | $72.99 | 2 | $145.98 | |
| T&M Weekly | $217.99 | 24 | $5,231.76 | |
| **Time & Mileage Total** | | | | **$5,377.74** |
| | | | | |
| LDW | $16.95 | 170 | $2,881.50 | |
| SLI | | | $0.00 | |
| PPP | | | $0.00 | |
| PAI | | | $0.00 | |
| Additional Driver Fee | | | $0.00 | |
| Underage Fee | | | $0.00 | |
| GPS Rental | | | $0.00 | |
| Drop | | | $0.00 | |
| Vehicle Lice | 0.69 | 170 | $117.30 | |
| Tourism Surc 2.500% | | | $0.00 | |
| APCONCRECFEE 10.500% | | | $565.00 | |
| CNTYRNTL | 2.00% | | $108.00 | |
| State tax | 6.00% | | $323.00 | |
| Repairs | | | $1,757.02 | |
| Storage | | | $0.00 | |
| Pre-paid Fuel | | | $0.00 | |
| Keys | | | $0.00 | |
| NAV | | | $0.00 | |
| Cleaning Fee | | | $0.00 | |
| | | | $0.00 | |
| **Daily Charges/Optional Items Total** | | | | **$5,751.82** |
| | | | | |
| **Total Rental Charges** | | | | **$11,129.56** |
| Funds Collected = $469.00 | | | $469.00 | |
| **Balance Due** | | | | **$10,660.56** |